[Civ. No. 29157. First Dist., Div. Four. Apr. 14, 1971.]

EAST BAY MUNICIPAL UTILITY DISTRICT, Petitioner, v. NATHAN J. SINDELAR, as Treasurer, etc., Respondent.

COUNSEL

John B. Reilley, Orrick, Herrington, Rowley & Sutcliffe and George Herrington for Petitioner.

Robert T. Anderson for Respondent.

OPINION

**RATTIGAN, J.**—This is an original petition for writ of mandate, filed by the East Bay Municipal Utility District, a public agency (hereinafter the "district"), to compel respondent Nathan J. Sindelar, its treasurer, to execute certain bonds in connection with their issuance and sale by the district as authorized by its board of directors. We have concluded that the district has properly invoked the original jurisdiction of this court, that respondent's contention that the bonds are unauthorized is without merit, and that a peremptory writ of mandate should issue as prayed.

The board of directors, ordering issuance and sale of the bonds by resolution adopted in 1970, purported to act pursuant to authorization voted by the district's electors in 1958. As the essential question is whether the 1958 authorization reaches the current bond issue despite the lapse of time, and events before and since the 1958 bond election, we set forth pertinent historical details as follows:

The district was formed in 1923, and has functioned since, pursuant to the Municipal Utility District Act (Pub. Util. Code, div. 6 [commencing with § 11501]). At all pertinent times, it has owned and operated a water system in which, among other things, water is collected and stored in watersheds east of the San Francisco Bay Area and transmitted to the district's water customers in Alameda and Contra Costa Counties. Prior to 1958, the district undertook a study of the system's capacity to meet the projected future water needs of its customers. The study first produced a report, published by the district's Construction Program Committee in August 1957, which proposed a detailed construction program addressed to those needs. The report (entitled "Proposed Construction Program 1957 to 1967") projected water consumption demands in the district's service area as "200 million gallons daily by 1967," presented "a program of construction to meet these needs, and an estimate of the cost, during the 10-year

period ending June 30, 1967." It contained several references to "the 10-year period to 1967" and to forecasting and programming "to 1967."[1]

Bechtel Corporation, an independent consulting firm engaged by the district for the purpose, reviewed the proposal and submitted a report, in December 1957, entitled "Engineering-Economic Feasibility Review Of Proposed Construction Program 1957 to 1967."[2] Bechtel therein referred to the proposal as a "10-year construction program which will include additional Mokelumne River storage, a third aqueduct for increased water supply from that river, additional terminal storage reservoirs within the service area, added filtration facilities, new and enlarged pumping plants, distribution mains, local distribution storage and correlated facilities." As the 1957 district report had done, the Bechtel report consistently referred to a "10-year construction program" and pertinent projections "to 1967."

In February 1958, the district's board of directors enacted "Ordinance No. 191," which called a bond election to be conducted, in June of the same year, for the purpose of submitting to the district's electors the question whether the district should incur a bonded indebtedness of $252,-000,000 to finance the proposed construction program.[3] Prior to the

---

[1]In the report, however (to which we hereinafter refer as "the 1957 district report"), the following statement also appeared: "Several major additions to the District's water system will be needed in the first several years following 1967, as water consumption continues to increase beyond the 200 million gallons daily rate forecast for that date. . . . In addition to these major projects, the construction of facilities such as distribution storage, pumping plants, and pipe lines will continue at or near the rate proposed for period to 1967, depending upon the rate of increase in consumption after that date."

[2]We hereinafter refer to this document as "the Bechtel report."

[3]As stated in Ordinance No. 191 and on the ensuing ballot, the question put to the district's electors read as follows:

"MEASURE: (Water Development Project for East Bay Area). Shall the EAST BAY MUNICIPAL UTILITY DISTRICT incur a bonded indebtedness in the principal amount of . . . [$252,000,000] . . . for the acquisition, construction and completion of the following utility works, to-wit: Water storage, transmission and distribution facilities, works, structures and property, together with filtration plants, pumping plants, aqueducts, mains, pipe lines, tunnels, dams, reservoirs, power plants, machinery, equipment, lands, easements, rights of way, water rights, reconstruction, replacements and additions to existing facilities, and also all other works, structures, rights and property, within and without the District, necessary or convenient to carry out of the objects, purposes and powers of the District?"

The ordinance described the purpose of the proposed construction project in this language:

"The fundamental and basic objective of the Water Development Project for East Bay Area . . . is to provide an adequate system of water storage, with appropriate transmission facilities and facilities for water distribution to consumers of the District. Based upon engineering studies, reports and data of the District, it is now contemplated that an additional source of water supply will be developed and appropriate aqueducts and water transmission facilities will be constructed to deliver water through terminal and distribution reservoirs for ultimate distribution through distribution mains. Appur-

scheduled election, the district circulated publicity handouts ("Facts"), and other materials, which consistently referred to the "Water Development Project for the East Bay Area" as a "10-year program."[4]

At the bond election conducted in June, 1958, the ballot proposition carried. The district forthwith commenced the issuance and sale of authorized bonds, and the construction program. Pursuant to the electors' 1958 authorization, the district issued and sold bonds in "series" as follows:

| Series | Principal Amount | Year of Sale |
|--------|------------------|--------------|
| A | $25,000,000 | 1959 |
| B | 30,000,000 | 1960 |
| C | 30,000,000 | 1962 |
| D | 33,000,000 | 1962 |
| E | 30,000,000 | 1963 |
| F | 20,000,000 | 1966 |

The district's "official statements" accompanying some of these issues referred to the project as a "10-year program" and as consisting of the facilities described before the 1958 election. (See text at fn. 4, *ante.*)

■ According to its present petition for mandate, "[b]y the year 1967 the District had completed most of the principal and major features of the Water Development Project for East Bay Area. . . ."[5] In April 1967,

___

tenant facilities, structures, equipment and pumping plants will be provided, and provision made for the incidental use of water for hydro-electric development. The present engineering studies of the District contemplate a construction program over a period of years so as to provide an adequate and comprehensive water system based on forecasted population growth and expansion of the area to be served by the District. In view of the long range program, the exact detail of each individual item of construction in the overall comprehensive project will be left to the discretion of the Board of Directors who will be limited in their determination by the objects and purposes as set forth in the measure submited to the voters."

The ordinance further provided that the bonds proposed "may be issued in series from time to time as may be determined by the Board of Directors [of the district] until the Water Development Project for East Bay Area is finally completed. . . ."

[4]The district's pre-election materials also included this description of the project's details and the costs allocated to each:

| "1. Mokelumne Storage | $ 42,338,000 |
|------------------------|--------------|
| 2. Mokelumne Aqueduct #3 | 68,233,000 |
| 3. Terminal Reservoir Storage | 38,906,000 |
| 4. Filter Plants | 14,105,000 |
| 5. Distribution Reservoirs | 26,781,000 |
| 6. Pumping Plants | 4,279,000 |
| 7. Distribution Mains | 65,653,000 |
| 8. Other Construction & Equipment | 22,713,000 |
| Total | $283,008,000" |

[5]The petition describes the completed "features" as "including (1) the construction of the Camanche Dam on the Mokelumne River to provide an adequate source of water

a press release issued by the district announced that public officials and civic leaders of Alameda and Contra Costa Counties had, on April 18, attended "ceremonies marking the virtual completion of the East Bay Municipal Utility District's quarter-billion dollar Water Development Program." On October 27, 1967, the district's finance department issued its quarterly statement reporting that "[a]s of June 30, 1967 the fundamental and basic objectives of the Project had been essentially achieved," with remaining costs thereof assessed at "$9,427,865, or 3.91% of the total presently estimated Project cost." The statement further reported that "[t]he Series F bond sale was the last borrowing required to complete financing of the entire Project."

The actual cost of the project, and the amount of bond funds required to defray it, proved to be less than the Bechtel report had estimated. For this reason, $84,000,000 in bonds authorized in 1958 remained unissued at the end of the 10-year period terminating in 1967. By 1970, district water consumption had increased to 219,000,000 gallons daily, and its service area had expanded from 230 square miles (in 1958) to 277 square miles. The district estimated that by the year 2000 its service area would include more than 400 square miles and that its water consumption would exceed 400,000,000 gallons daily. The decision was reached that additional facilities would be needed to accommodate the expanded area and the increased demands for water.

On December 8, 1970, the district's board of directors adopted a resolution authorizing the issuance and sale of another $12,000,000 in bonds ("Series G"), pursuant to the 1958 authorization and with the proceeds to be used for the construction of further facilities. The resolution stated among other things that the proposed Series G issue was "deemed necessary and desirable . . . to provide additional moneys to finance the Water Development Project for East Bay Area as authorized at . . . [the 1958 bond] . . . election."[6]

---

supply, (2) the construction of the Mokelumne Aqueduct No. 3 for the transmission of water from the source of supply to the District's service area, (3) the construction of Briones Reservoir to provide additional terminal reservoir storage within the District's service area, (4) the construction of new and improved water treatment facilities, and (5) additions, improvements and extensions of local water system distribution facilities. . . ." (Compare fn. 4, *ante*.)

[6]The resolution thus referred to the newly contemplated facilities as part of the "Water Development Project for East Bay Area," but did not describe them. The district alleges in its petition that "[t]he proceeds of the Bonds of Series G are intended to be applied to the construction of additional terminal reservoir storage facilities, transmission aqueducts, pumping plant facilities, water treatment facilities, distribution system storage facilities, distribution pipelines and related facilities to serve the expanding area of and increased consumption demands within the service area of the District in both Alameda and Contra Costa Counties; said facilities include Moraga

Respondent, who as the district's treasurer is obligated to sign its duly authorized bonds (Pub. Util. Code, § 13244), refused to sign the Series G bonds as the 1970 resolution directed him to do, and as demanded of him by the district, upon the following grounds: "1. That . . . [the district] . . . is without authority to issue said Bonds of Series G or any part thereof for the reason that the Water Development Project for East Bay Area has been fully constructed and completed and that no authority exists for the issuance of said bonds purely for the expansion of the water system of the District based upon the expanded area and increased water demand of the District since the date of . . . [the 1958 bond] . . . election, to wit, since June 3, 1958. 2. That it was generally understood by the electors of the District voting upon the proposition for the issuance of said bonds that the construction program would end within a period of ten years and that no additional bonds would be issued or sold more than ten years after the date of said election and that the authority to issue and sell said bonds accordingly expired on June 3, 1968, to wit, ten years from the date of said election. 3. That more than twelve years have elapsed since the date of said election and by reason solely of the lapse of time the authority granted by the electors for the issuance and sale of the bonds has ceased to have any effect and the authority of the District to issue and sell said bonds has accordingly expired."

■ The absence of an adequate remedy in the ordinary course of law was determined by our granting the alternative writ. (*County of Sacramento* v. *Hickman* (1967) 66 Cal.2d 841, 845 [59 Cal.Rptr. 609, 428 P.2d 593].) Making the writ returnable before this court, we also necessarily determined that the proceeding is a proper one for the exercise of our original jurisdiction. (*Id.* See rule 56(a), Cal. Rules of Court.) We were persuaded in these respects (1) by the allegations, in the district's petition for mandate, that the now-contemplated construction is "urgently required in order to provide water for domestic and other uses, including fire protection, for the protection of the health and safety of water consumers of the District" and cannot be undertaken until the bonds in question can be sold; and (2) because respondent has not objected to our exercising original jurisdiction. (See 3 Witkin, Cal. Procedure (1954) Extraordinary Writs, § 31, par. [c], p. 2503, and cases cited.) Having made this determination, we turn to the merits.

The Municipal Utility District Act limited expenditure of the proceeds of the district's bonds authorized in 1958 to "the objects or purposes for

No. 2 Aqueduct and pumping plant, Walnut Creek No. 3 pumping plant, water treatment facility improvements and additions at the Orinda, Upper San Leandro, Sobrante, Walnut Creek, Lafayette and San Pablo filter plants, together with acquisition of property for the American Aqueduct."

which the bonds were voted." (Pub. Util. Code, § 13262.) The statutory restriction reflects the general rule, which restricts expenditure of the proceeds of publicly approved bonds (*O'Farrell* v. *County of Sonoma* (1922) 189 Cal. 343, 348-349 [208 P. 117]; *Mills* v. *S. F. Bay Area Rapid Transit Dist.* (1968) 261 Cal.App.2d 666, 668 [68 Cal.Rptr. 317]) and which rests upon theories that such restriction is contractual in nature, or that it derives from a status which is analogous to a contractual relationship, or that it is implicit in a requirement of popular approval for a given bond issue. (*Mills* v. *S. F. Bay Area Rapid Transit Dist., supra,* and cases cited.) As stated in the district's Ordinance No. 191 calling the 1958 bond election, the purpose of the proposed bonds was to finance the "Water Development Project for East Bay Area." (See fn. 3, *ante* [fourth paragraph].) According to the physical description of that "Project," as unofficially circulated then and since (see text at fn. 4, *ante*), construction of its physical components had been completed by 1967; the district acknowledged the event by reporting and celebrating it. ■ There is evidence, thus, to support respondent's contention that the voter-approved purpose of the 1958 bonds had been served, in fact and by popular definition, by 1967.

In identifying that purpose, though, and the extent (if any) to which it imposed any restrictions upon the expenditure of the proceeds of the bonds voted in 1958, we are to consider the language of the ballot proposition submitted to the electorate at that time. (*Mills* v. *S. F. Bay Area Rapid Transit Dist., supra,* 261 Cal.App.2d 666 at p. 668.) Publicity disseminated by the district to its voters at the time, or representations made by it or its officials then or since, cannot be deemed to have modified or qualified the official proposition which was voted upon in 1958. (*City of Los Angeles* v. *Dannenbrink* (1965) 234 Cal.App.2d 642, 655 [44 Cal. Rptr. 624]; *Behneman* v. *Alameda-Contra Costa Transit Dist.* (1960) 182 Cal.App.2d 687, 696 [6 Cal.Rptr. 382].) The law does not recognize "informal understandings" which purport to vary'from the official terms: "the proposition submitted to the electors and upon which bonds are voted, and which is later evidenced by the bonds themselves, constitutes a contract, and necessarily the only contract between the parties. . . . [T]here is no place in the entire procedure for understandings except such as are expressed in the submission upon which the electors vote." (*Jennings* v. *Clearwater School Dist.* (1923) 65 Cal.App. 102, 105 [223 P. 84].) In spending the bond proceeds the district is not restricted, either, by statements made in engineering or feasibility reports (such as the 1957 district report and the Bechtel report) upon which the 1958 bond proposal was based. (*El Dorado Irr. Dist.* v. *Browne* (1932) 216 Cal. 269, 273-274 [13 P.2d 921]; *Clough* v. *Duffy* (1907) 152 Cal. 311, 313-315 [92 P. 859].)

 Ordinance No. 191 referred to the proposed construction program as the "Water Development Project for East Bay Area," but did not describe the physical facilities involved in the overall project; it referred to them in very broad terms of development of "an additional source of water supply" and construction of "appropriate aqueducts and water transmission facilities" which, with "appurtenant facilities," would "provide an adequate and comprehensive water system . . ." (See fn. 3, *ante* [fourth paragraph].) The 1958 ballot proposition which was stated in the ordinance, and which put the essential question to the district's electors in 1958, mentioned the "Water Development Project for East Bay Area" by name, but described the proposed facilities in even broader terms. (*Id.* [second paragraph].) Neither source referred to a "10-year program," and neither indicated that the proposed facilities would be completed, or that the bonds would be issued and sold to finance its completion, within any specified period of time: to the contrary, Ordinance No. 191 mentioned the district's contemplation of "a construction program *over a period of years* so as to provide an adequate and comprehensive water system. . . ." (*Id.* [fourth paragraph; italics added here].)

 Bond propositions may be validly submitted to the voters in broad and general terms. (*Sacramento M. U. Dist.* v. *All Parties, etc.* (1936) 6 Cal.2d 197, 202 [57 P.2d 506]; *O'Farrell* v. *County of Sonoma, supra,* 189 Cal. 343, 347; *Mills* v. *S. F. Bay Area Rapid Transit Dist., supra,* 261 Cal.App.2d 666 at p. 668.) "The purpose for which . . . [bond] . . . elections are required is to obtain the assent of the voters to a public debt, to the amount, and for the object, proposed. The amount must, of course, be stated on the ballot; the general purpose must be stated with sufficient certainty to inform the voters and not mislead them, as to the object intended; but the details of the proposed work or improvement need not be given at length in the ballot." (*Clark* v. *Los Angeles* (1911) 160 Cal. 317, 320 [116 P. 966].) Thus, the language of the district's Ordinance No. 191, and of the ballot proposition which it addressed to the electorate, was sufficiently specific as to the object and purposes of the bonds proposed. (See, e.g., *El Dorado Irr. Dist.* v. *Browne, supra,* 216 Cal. 269 at pp. 273-274; *Clough* v. *Duffy, supra,* 152 Cal. 311 at p. 314; *Mills* v. *S. F. Bay Area Rapid Transit Dist., supra,* 261 Cal.App.2d 666 at pp. 668-669; *Behneman* v. *Alameda-Contra Costa Transit Dist., supra,* 182 Cal.App.2d 687 at pp. 695-696.) At the same time, it was sufficiently broad to reach and include the purposes of the Series G bond issue proposed at this time. Thus, the proposed bonds are within the authorization voted by the district's electors in 1958 and, contrary to respondent's present position, the district is entitled to the relief sought

herein. (Code Civ. Proc., § 1085; Pub. Util. Code, § 13244; *County of Sacramento* v. *Hickman, supra,* 66 Cal.2d 841 at p. 845.)

Let a peremptory writ issue as prayed.

Devine, P. J., and Christian, J., concurred.

On May 4, 1971, the opinion was modified to read as printed above.