[No. A110378. First Dist., Div. Two. May 26, 2006.]

SEAN PATRICK MONETTE-SHAW, Plaintiff and Appellant, v. SAN FRANCISCO BOARD OF SUPERVISORS et al., Defendants and Respondents.

COUNSEL

Lynn S. Carman for Plaintiff and Appellant.

Dennis J. Herrera, City Attorney, Wayne K. Snodgrass and Thomas S. Lakritz, Deputy City Attorneys, for Defendants and Respondents.

OPINION

BUSCH, J.—

## Introduction

This is an appeal from the trial court's denial of a petition for writ of mandate seeking to prevent the City and County of San Francisco (City) from

diverting tobacco settlement revenues away from the project to replace Laguna Honda Hospital and to require the City to maintain Laguna Honda as a 1,200-bed skilled nursing facility. We affirm.

## Factual Background and Procedural History

Laguna Honda Hospital, founded in 1866, has long been a fixture in the City, providing continuing care services to the City's elderly and chronically disabled population without regard to ability to pay. As of 1999, the City operated Laguna Honda as a 1,200-bed skilled nursing facility. By the late 1990's, its physical condition was seriously deteriorating, it suffered damage from the 1989 earthquake, and its open-ward structure was outmoded, leaving it at risk to lose federal funding that was critical to its survival. Also, in 1998, the City settled litigation it had brought against the tobacco industry. As of 1999, the City was projecting that it would receive more than $580 million in settlement payments over the next 37 years. The proceeds of this settlement gave the City a unique opportunity to address the serious problems at Laguna Honda.

In November 1999, the voters of the City approved Proposition A, a ballot measure authorizing the City to incur $299 million in debt for a health care facility to replace Laguna Honda Hospital, and dedicating certain revenues derived from the settlement with the tobacco industry to help pay for the replacement facility. After passage of Proposition A, the City began planning the project. In February 2004, the City authorized sale of bonds pursuant to Proposition A. In October 2004, the City received construction bids for the project as originally contemplated that significantly exceeded the project's budget. Also in October 2004, in response to the escalating cost of the project, the City adopted an ordinance allowing it to negotiate with bidders to try to reduce the project costs. The project was then rebid.

During this same time period, the City was experiencing a severe economic downturn. In fiscal year 2003–2004, the City faced an unprecedented budget deficit. The tobacco settlement, however, was a fiscal bright spot. As of June 2003, projections indicated that the City would receive $238 million more over 37 years than projected at the time Proposition A was placed on the ballot. By the beginning of fiscal year 2003–2004, including interest that would be earned during the coming fiscal year, that unexpected windfall already equaled $25 million. On July 25, 2003, still before any bonds were authorized or issued pursuant to Proposition A, the City enacted an ordinance

authorizing the transfer of $25 million of tobacco settlement payments from the tobacco settlement revenue sub-account[1] to its general fund.

Petitioner, a resident of the City, brought this writ of mandate action in November 2004 in the San Francisco Superior Court seeking an order that the City (a) return the $25 million and not divert any tobacco settlement funds away from the Laguna Honda project and (b) maintain Laguna Honda as a skilled nursing facility with at least 1,200 inpatient beds unless the City could satisfy certain conditions. On April 4, 2005, the superior court, having heard oral argument, entered judgment on its order denying the writ of mandate, from which this appeal is taken.

## Analysis

Because this case turns on application of settled principles of statutory interpretation as applied to the Proposition A bond measure, and not on disputed issues of fact, our review is de novo. "In reviewing a trial court's judgment on a petition for writ of ordinary mandate, the appellate court applies the substantial evidence test to the trial court's factual findings, but exercises its independent judgment on legal issues, such as the interpretation of statutes." (*Abbate v. County of Santa Clara* (2001) 91 Cal.App.4th 1231, 1239 [111 Cal.Rptr.2d 412].)

In *Associated Students of North Peralta Community College v. Board of Trustees* (1979) 92 Cal.App.3d 672 [155 Cal.Rptr. 250] (*Associated Students*), Division One of this court reviewed the law governing interpretation of voter-approved bond measures. In that case, as in the second issue addressed here, the petitioner appealed from the superior court's denial of a petition for writ of mandate seeking to constrain the public entity's use of bond proceeds. (*Id.* at p. 676.) We noted that the relationship between the public entity and its electors had been characterized variously as either contractual or as analogous to contract, but that under either characterization the same elements comprise what we referred to as the " 'contract' between the entity and its electors." (*Id.* at pp. 676–677.) The four "primary" elements from which to derive the terms of the "contract" are: (1) the statutes creating the bonding entity and authorizing bonded indebtedness; (2) "[t]he resolution by which the bonding entity resolves to submit the issue to [its] electors"; (3) "the ballot proposition submitted to the voters"; and (4) the voters' assent or ratification. (*Id.* at pp. 677–678.) "Extrinsic documents may be added to the primary elements," but courts have generally looked to such extrinsic aids

---

[1] This account was set up to hold tobacco settlement payments in excess of $1 million per year. It was codified in San Francisco Administrative Code section 10.100-218. As originally enacted in December 2000, funds in this account could be used for construction of the Laguna Honda replacement or payment of debt incurred pursuant to Proposition A.

only where the extrinsic documents were themselves specifically referred to in one of the primary documents. (*Id.* at p. 678; *Flood Control Dist. v. Wright* (1931) 213 Cal. 335, 340, 350 [2 P.2d 168] [the proposition referred to the report of the chief engineer, which was distributed to voters]; *Robbins v. Sonoma County Flood etc. Dist.* (1956) 138 Cal.App.2d 291, 294 [292 P.2d 52] [the ballot question referred to the project as being "more particularly described" in an extrinsic document].)[2]

## I.  Transfer of Tobacco Settlement Money to the General Fund

Petitioner argues that Proposition A requires the City to apply *all* money received from the tobacco settlement to the Laguna Honda project (with the exception of the first $1 million annually that is set aside for tobacco education) and that, therefore, the City was not permitted to allocate the $25 million to the general fund. Petitioner contends that certain language in the voter pamphlet summary of Proposition A should control over conflicting language in the ordinance by which Proposition A was placed on the ballot. This argument fails for several reasons.

■ The primary "contract" documents are unambiguous. The bond ordinance, which was included in the voter information pamphlet distributed to voters prior to the election, in its title, "provid[es] for the use of *available tobacco settlement revenues*" and, in section 3, requires that "[t]he first $100,000,000 of *available tobacco settlement revenues*" must be used for the Laguna Honda project. (Italics added.) Section 2 of the ordinance, "[f]or purpose of this ordinance and the proposition to be voted upon," defines " '[a]vailable tobacco settlement revenues' " to mean "the total payments the City and County receives under the 1998 Master Settlement Agreement (the 'Agreement') *over the term of* any lease financing, bonded debt and/or other evidences of indebtedness authorized hereby that the City and County may use for the project under applicable law, less $1,000,000 of the amount the City and County receives each year under the Agreement during the term of any obligations authorized hereby, which amount the City and County will use for tobacco education, prevention and control purposes." (Italics added.) It follows that the ordinance only committed funds received once the bonds

---

[2] As *Associated Students* points out, even where this test is satisfied, and an extrinsic document comes into play, it is not clear how restrictive such a document can be. "Thus several cases have concluded that, even where quite specific engineering and economic feasibility reports have been incorporated, the District is not restricted by statements made in such reports. [Citation.] And this has been true even where the report was required before the bond proposal could be submitted to the electorate, at least where the report is merely mentioned by reference or recital in the ordinance calling for the election. [Citations.]" (*Associated Students, supra,* 92 Cal.App.3d at p. 678.)

were issued—i.e., once the term of the bonds had commenced. Because funds received before any bonds issued, including the $25 million at issue in this action, are not received during the term of the bonds, they are not "available" within the meaning of the ordinance and, therefore, are not pledged to the project.

The same distinction is carried through the other relevant primary element of the bond "contract"—the ballot proposition submitted to the voters. It stated: "Shall the City and County incur bonded debt . . . and reduce the property tax impact by requiring the application of *available tobacco settlement revenues*" to finance the project. (Italics added.) Again, the proposition specifically uses the same defined term as the ordinance.[3] The use of the adjective "available" to modify "tobacco settlement revenues" clearly indicates that some subset of all such revenues is intended, and the page reference to the full text of the ordinance appears at the bottom of the page.[4] Of course, " 'we must assume that the voters considered the text and thereby familiarized themselves with any omitted subsidiary matter.' " (*Horneff v. City & County of San Francisco* (2003) 110 Cal.App.4th 814, 824 [2 Cal.Rptr.3d 79].)

Against all this, petitioner points to the digest by the City's Ballot Simplification Committee (BSC), which was also included on the first page of the section of the voter information pamphlet devoted to Proposition A and which stated, "Proposition A also provides that *all* tobacco settlement monies received by the City, after $1 million is set aside each year for smoking education and prevention programs, would be used to pay for [the Project]." (Italics added.) Petitioner argues that the use of the word "all" in this sentence creates an ambiguity that requires the court to interpret the voters' intent to require the City to disregard the plain language of the ordinance. Petitioner's argument on this point also fails for several reasons.

---

[3] And, as we have noted, the ordinance defined the term both for its own purposes and for purposes of the proposition. We, therefore, reject petitioner's argument that there is any inconsistency between the ordinance and the proposition or that some contrary lay understanding of the word "available" could create such a conflict.

[4] Petitioner does not contest the meaning of the ordinance's language. Instead, petitioner would disparage the definitional language and its placement as "Philadelphia Lawyer language hidden away in an obscure section of a single-spaced 6-point ordinance set forth on the 22d page of a very long Voters Pamphlet section on Proposition A." The need for carefully crafted language in documents that form the foundation for issuing nearly $300 million worth of municipal bonds is obvious whether in Philadelphia or San Francisco, and the placement of the text of the ordinance at the end of all the arguments pro and con is consistent with standard practice and of no substantive import. The length of the section only reflects the significant public interest in the measure that generated so many paid arguments, which, in turn, reinforces the usual presumption referred to in the text that voters are familiar with the terms of the ordinance. (See *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 243 [149 Cal.Rptr. 239, 583 P.2d 1281].)

First, following the *Associated Students* case, the digest is not the sort of extrinsic document that a court would look to in determining the terms of the "contract" between the City and the voters. None of the primary documents referred to the digest or suggested to the voters that they should rely on the digest to add detail to the ordinance or the proposition language. Nor is that the function of the BSC. In fact, the reverse is true.

■ Two opinions of Division One of this court have thoughtfully explained the purpose and function of the BSC. (*Horneff v. City & County of San Francisco, supra,* 110 Cal.App.4th 814 [2 Cal.Rptr.3d 79]; *Brennan v. Board of Supervisors* (1981) 125 Cal.App.3d 87 [177 Cal.Rptr. 677].) Each of these cases involved a preelection challenge asking the superior court to change allegedly inaccurate or incomplete language in the digest.[5] The BSC exists pursuant to the City's Municipal Elections Code (MEC) as a body of communications and language professionals (MEC, § 600) charged with preparing a summary of no more than 300 words with an eighth-grade level of "readability" (MEC, § 515, subds. (b)–(c)). The BSC has no legislative, administrative, or judicial power—merely the ministerial duty of preparing a brief, simple summary.[6] (*Brennan v. Board of Supervisors, supra,* 125 Cal.App.3d at p. 91.) Its digest "is but a simplified summary of the measure, and is not intended to provide a complete catalogue or index of every detail." (*Horneff v. City & County of San Francisco, supra,* 110 Cal.App.4th at p. 823.) Neither the MEC nor any other source of law gives the BSC the power to alter, amend, or interpret any ordinance, let alone a bond ordinance.

Nor is the BSC charged with implementing or administering this or any other ordinance, so its summary cannot be entitled to the deference usually given to an interpretation of an ordinance by a body that does have such responsibility. That deference is typically reserved for an "agency charged with its enforcement and interpretation." (See *International Business Machines v. State Bd. of Equalization* (1980) 26 Cal.3d 923, 930–31 [163 Cal.Rptr. 782, 609 P.2d 1].)[7] It follows that the digest has no independent force of law and should not be treated as an element of the bond "contract"

---

[5] In each of these cases, the superior court agreed with the petitioner and ordered changes in language. In each case the issue did not reach the Court of Appeal until after the election. In each case, the Court of Appeal chose to exercise its discretion to consider the issue presented as capable of repetition, yet evading review. In each case the Court of Appeal concluded that the superior court erred in ordering changes because, even though the court's changes made the digest more accurate, the digest as originally drafted, though incomplete, was not false or misleading. Finally, in each case, the Court of Appeal affirmed the judgment because, despite the error, there was no prejudice since the revised version was, in fact, more accurate.

[6] Therefore petitioner is incorrect to refer to the BSC as "ruling" on or "constru[ing]" the meaning of the ordinance.

[7] Petitioner also asserts in passing that the City's Board of Supervisors contemporaneously construed Proposition A to impose a trust on all tobacco settlement payments for the benefit of

under the principles of *Associated Students*. The lesson of *Horneff* and *Brennan* is that the BSC has significant leeway in deciding what to include in its summary and that the summary need not address auxiliary or subsidiary provisions or be complete so long as it is not misleading. That very leeway makes the BSC digest a less than reliable guide to the courts in deciding what restrictions are placed on the City by the ordinance's lawyerly definitional language that is not addressed in the digest.

■ Second, under ordinary rules of statutory interpretation, a court would not look to an extrinsic document for help interpreting an ordinance that is clear on its face. This is the rule of *Legislature v. Eu* (1991) 54 Cal.3d 492, 504–505 [286 Cal.Rptr. 283, 816 P.2d 1309], on which petitioner would rely.[8] Instead, a court looks to " 'indicia of voters' intent other than the language of the provision itself' " only to help resolve ambiguities in " 'the provision itself.' " (54 Cal.3d at pp. 504–505.) "Courts may look to [extrinsic sources] to construe a statute *only* when the statutory language is susceptible of more than one reasonable interpretation." (*Pacific Gas & Electric Co. v. Public Utilities Com.* (2000) 85 Cal.App.4th 86, 92 [102 Cal.Rptr.2d 20].) "[W]hen statutory language is 'clear and unambiguous there is no need for construction, and courts should not indulge in it.' " (*Ibid.*, quoting *Solberg v. Superior Court* (1977) 19 Cal.3d 182, 198 [137 Cal.Rptr. 460, 561 P.2d 1148].) No principle of statutory construction allows petitioner's circular argument— using extrinsic evidence of voters' intent to create an ambiguity, using that ambiguity to allow consideration of extrinsic evidence, and then using the original extrinsic evidence to construe an ambiguity it created itself. "Where the statute is clear, courts will not 'interpret away clear language in favor of an ambiguity that does not exist.' [Citation.]" (*Hartford Fire Ins. Co. v. Macri* (1992) 4 Cal.4th 318, 326 [14 Cal.Rptr.2d 813, 842 P.2d 112].)

■ Third, we reject petitioner's argument that the digest language should override the ordinance language in order to avoid subjecting the voters to a "bait and switch." This argument sells the voters short by ignoring the presumption that they are familiar with the language of the ordinance, have duly considered it, and have voted intelligently. (*Amador Valley Joint Union*

---

the Laguna Honda project. The board of supervisors does have power to implement Proposition A. In fact, however, the board of supervisors merely created an account to hold such funds and authorized their use for certain purposes. They did not state that Proposition A compelled all deposited funds to be used solely for the authorized purposes, whereas they did state that the $1 million per year portion deposited in a separate sub-account could be used "solely" for tobacco education purposes. Ultimately, of course, the board of supervisors' understanding is reflected in its 2003 decision to divert some of the prebond settlement payments to a different purpose.

[8] The City argues that the rule of *Legislature v. Eu, supra,* 54 Cal.3d 492, does not apply to expand the elements considered by a court in the specialized contractual or quasi-contractual field of bond ordinances. Because we find no relevant ambiguity in the bond ordinance, we need not reach this issue.

*High Sch. Dist. v. State Bd. of Equalization, supra,* 22 Cal.3d 208, 243–244.) The argument also presumes an intent to mislead or advocate that is wholly unsupported by the record and inconsistent with the charter of the BSC. The BSC is set up simply to write a neutral summary. It does not exist to promote the legislation that it summarizes. Of course, if petitioner believed that the digest was inaccurate or misleading, he had the right to follow the procedure employed in the *Brennan* and *Horneff* cases to seek correction. Indeed, "[t]he purpose of [Elections Code] section 9295 is to establish a preelection procedure for the timely correction of election materials."[9] (*Horneff v. City & County of San Francisco, supra,* 110 Cal.App.4th at p. 824.) The overriding principle in this case is that extrinsic documents and statements disseminated to the voters cannot be allowed to alter the meaning of the unambiguous primary elements of the bond "contract" without destroying certainty and promoting endless litigation over bond measures.

Petitioner's argument echoes the " 'public policy' " argument addressed in *Associated Students*. There, having concluded that the evidence did not support an intent to mislead, the court went on to observe "that if whenever a group of voters considered that their electoral will had been frustrated, they could argue for implementation of *their* understanding of the sense of official assurances, preelection statements, publicity and unofficial discussions, an intolerable number of disputes would result." (*Associated Students, supra,* 92 Cal.App.3d at p. 680.) To the extent any individual voter may have read the digest to mean something different than the ordinance it summarized, that is unfortunate, but it cannot alter the plain meaning of the ordinance.

## II.   Characteristics of Replacement Project

Petitioner, fearing that the City intends to build a significantly smaller and different new facility,[10] also argues that Proposition A requires the City to

---

[9] We express no opinion as to the likely outcome of such a challenge, had it been brought. The issue would have been whether, given the context of the digest, the word "all" was inaccurate or misleading as opposed to whether the digest would be deemed merely incomplete for not having included the modifier "available" with its definition. In deciding that question, the trial court would have been bound by the rule that " 'if reasonable minds may differ as to the sufficiency of the summary, it should be held sufficient.' " (*Horneff v. City & County of San Francisco, supra,* 110 Cal.App.4th at p. 823.)

[10] Petitioner argues that the City has already decided to build a smaller facility. The City counters that, although nothing prevents it from changing the size or character of the project, it has so far only authorized value engineering discussions with bidders in order to reduce the cost of the facility in the face of massive budget overruns in the initial bid responses. The record on appeal does not answer the question, but, in light of our decision that Proposition A does not dictate the size or specific character of the replacement facility, this dispute is not material.

replace Laguna Honda with another 1,200-bed skilled nursing facility[11] and that the City has no discretion to alter these characteristics of the replacement project, at least without satisfying certain evidentiary prerequisites.[12] This argument fails for many of the same reasons explained above.

We start again with the language of the primary elements of the "contract." The ordinance title states that the bonds will be issued "for the acquisition, improvement, construction and/or reconstruction of a health care, assisted living and/or other type of continuing care facility or facilities to replace Laguna Honda Hospital." Section 1 of the ordinance authorizes the City to incur debt for the "Project," and section 2 defines the "Project" to "include, without limitation, all works . . . necessary or convenient for the acquisition, improvement, construction and/or reconstruction of a new health care, assisted living and/or other type of continuing care facility or facilities to replace Laguna Honda Hospital." The ballot proposition itself uses the same broad language, stating that the debt will be incurred "for the acquisition, improvement, construction and/or reconstruction of a new health care, assisted living and/or other type of continuing care facility or facilities to replace Laguna Honda Hospital."[13]

■ This language is intentionally broad and nonspecific. It is self-evidently drafted to leave the City significant flexibility in designing the replacement facility. There is nothing improper in providing for such flexibility. "[T]he rule is that public bodies may submit bond propositions in broad and general terms. Such a body may make its order of submission 'just as broad, and just as narrow[,]' or just as specific as it is willing to be bound by." (*Sacramento M. U. Dist. v. All Parties, etc.* (1936) 6 Cal.2d 197, 202 [57 P.2d 506], citing *O'Farrell v. County of Sonoma* (1922) 189 Cal. 343, 347 [208 P. 117]; *Tooker v. San Francisco Bay Area Rapid Transit Dist.* (1972) 22 Cal.App.3d 643, 649–650 [99 Cal.Rptr. 361] [declining to require particular construction because "general language was used; details of whether any, and which, parts of the proposed system would be elevated, or on the surface, or

---

[11] "Skilled nursing facility" is a legal classification meaning "a health facility that provides skilled nursing care and supportive care to patients whose primary need is for availability of skilled nursing care on an extended basis." (Health & Saf. Code, § 1250, subd. (c).) It is only one of a nonexclusive list of categories of "health facilit[ies]" recognized by law. (Health & Saf. Code, § 1250.)

[12] At oral argument, petitioner conceded that the City could build an 1,100-bed replacement facility, but not one with 800 or 900 beds. This concession reveals the fundamental error in petitioner's position. Once it is conceded that the replacement need not be a bed-for-bed replica, the City would be left with no principled limit on its discretion except the language of the ordinance itself.

[13] Indeed, in this instance, the BSC digest also uses essentially the same broad language, describing the bonds as being issued "to acquire, construct or reconstruct a health care, assisted living, and/or other type of continuing care facility or facilities to replace Laguna Honda Hospital."

underground, were nowhere stated"]; *Mills v. S. F. Bay Area Rapid Transit Dist.* (1968) 261 Cal.App.2d 666, 669 [68 Cal.Rptr. 317] [rejecting requirement of building particular station because "neither the ballot proposition nor the notice of election specified the location of any station, nor even required a station in or adjoining Lafayette"].) Here, the voters expressly granted the City freedom to choose among a broad range of options for replacing Laguna Honda.

On this issue, petitioner rests his argument on the use of the word "replace" in the bond documents and on ballot arguments suggesting that a new 1,200-bed facility would be built. Neither point is persuasive.

Petitioner contends "that it is impossible, given the commonly understood meaning of the words, 'to replace,' as used in both the *ballot proposal* and in the *bond ordinance*, and in the context of why the measure was placed on the ballot, to suggest that there was any other intent in the voters' passage of Proposition A, other than to replace the old 1,200-bed Laguna Honda Hospital skilled nursing facility, with a new 1,200-bed Laguna Honda Hospital skilled nursing facility." We disagree. The word "replace," particularly in the context it is used, cannot be limited to mean "build an exact replica," since the bond proposition and ordinance used open-ended language to define the project. They did not specify any particular kind or quantity of continuing care services. Again, there is no ambiguity in the primary documents. So long as the City uses the bond proceeds for "a new health care, assisted living and/or other type of continuing care facility or facilities," it is within its grant of authority.[14]

The various ballot arguments referring to a 1,200-bed replacement facility do not affect our analysis. First, they should not be considered because they are not primary elements of the "contract," and they are not referred to in the primary documents. (*Associated Students, supra,* 92 Cal.App.3d at pp. 677–678.) The primary bond documents do not refer to any specific plans for the replacement project. The record before us does not include any preexisting plans for the design or construction of the replacement facility, let alone any that were disseminated to the electorate or referred to as part of the ballot materials for Proposition A. Ballot arguments are just the advocacy

---

[14] Because the broad scope of the project is clear from the text of the proposition and ordinance, it is not necessary or appropriate to resort to dictionary definitions of "replace." Were we to do so as invited by petitioner, however, the result would be the same. "Replace" is defined in the American Heritage Dictionary (4th ed. 2000) page 1479, column 2, to mean "1. To put back into a former position or place. 2. To take or fill the place of. 3. To be or provide a substitute for. 4. To pay back or return; refund." This definition certainly includes building a new, but different, health care facility in the place of the old Laguna Honda. That new facility will take the place of and provide a substitute for the old facility even if it is not a bed-for-bed replica.

statements of interested parties. They do not reflect the understanding or intent of any voter other than their authors, and they "cannot be binding upon [the City] when such intent does not appear either in the resolution, the ballot proposition, or the governing statutes." (*Associated Students*, at p. 680; *City of Los Angeles v. Dannenbrink* (1965) 234 Cal.App.2d 642, 655 [44 Cal.Rptr. 624].) Second, there is no ambiguity that such arguments would be helpful in construing, again assuming arguendo that such potential indicia of voter intent can properly be consulted in construing a bond measure. (See *Legislature v. Eu, supra,* 54 Cal.3d at p. 505.) Instead, as we have already explained, the language in the bond documents is unambiguously broad and flexible.

This case again echoes *Associated Students*. In that case, all interested parties anticipated that the bond proceeds would be used to build four college campuses. (*Associated Students, supra,* 92 Cal.App.3d at pp. 674–675.) The bond resolution and proposition, however, generally authorized "school lots" and "school buildings" without specifying number or location. (*Id.* at p. 675.) For several years after the bonds were approved, the plans and expectations continued to be that four campuses would be built, but nearly a decade later the fourth campus was abandoned. (*Id.* at p. 676.) Nonetheless, because the primary elements of the "contract" did not require a fourth campus, the board of trustees was free to change its plans. So here, Proposition A does not bind the City to any particular size, floor plan, or configuration of services based on the expectations of petitioner or any other individual who had an expectation different from the language of the approved proposition and ordinance.

This result is not altered by the fact that some proponents and opponents of the measure told voters that Proposition A contemplated a 1,200-bed replacement facility. "No public official or private citizen is authorized to change the substance or effect of [a bond] proposal by the characterization he employs in advocating its adoption or defeat." (*City of Los Angeles v. Dannenbrink, supra,* 234 Cal.App.2d at p. 655; see *East Bay Mun. Util. Dist. v. Sindelar* (1971) 16 Cal.App.3d 910, 914–915, 918–919 [94 Cal.Rptr. 431] [giving no effect to "publicity handouts" circulated by the district prior to the election].)[15] Even if

---

[15] Petitioner finds significance in the fact that both proponents and opponents of Proposition A referred to a 1,200-bed replacement facility. In *Eu* the court looked to agreement between the ballot pamphlet arguments and rebuttals to those arguments. (*Legislature v. Eu, supra,* 54 Cal.3d at p. 505, citing to "Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with argument to voters, Gen. Elec. (Nov. 6, 1990)" at pp. 70–71.) Unlike the arguments referred to in that case, here most of the references on which petitioner would rely appeared in paid arguments, which do not provide an opportunity for rebuttal. Although the rebuttal to proponents' argument in favor of Proposition A does say that the proponents "want to rebuild Laguna Honda with the same number of beds and types of services the current facility provides," there was no statement specifying a particular size or type of service in the

the drafters' intent had been to replicate the size and type of service provided by the existing Laguna Honda Hospital, the voters did not restrict the City to that intent.[16]

## DISPOSITION

The judgment is affirmed. Appellant is to pay costs.

Kline, P. J., and Haerle, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 30, 2006, S144838.

---

proponents' argument in favor or, for that matter, in either the opponents' argument against or the rebuttal to opponents' argument against.

[16] It follows that Proposition A does not require the City to meet any particular evidentiary requirements before deciding what to build to replace Laguna Honda even if imposing any such conditions were otherwise appropriate.