[No. A126781. First Dist., Div. One. Dec. 10, 2010.]

MARLEEN SACKS, Plaintiff and Appellant, v.
CITY OF OAKLAND, Defendant and Appellant.

[No. A126817. First Dist., Div. One. Dec. 10, 2010.]

MARLEEN SACKS, Plaintiff and Appellant, v.
CITY OF OAKLAND, Defendant and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part III. of the Discussion of Petitioner's Appeals (beginning on p. 1095, *post*).

### COUNSEL

Donahue Gallagher Woods, David A. Stein; and Marleen L. Sacks for Plaintiff and Appellant.

John A. Russo, City Attorney, Barbara J. Parker, Assistant City Attorney, Mark T. Morodomi and Kevin D. Siegel, Deputy City Attorneys, for Defendant and Appellant and for Defendant and Respondent.

### OPINION

**DONDERO, J.**—Following a bench trial, a judgment was entered that granted in part and denied in part the petition for writ of mandate filed by Marleen Sacks (petitioner or Sacks), in which she contested the allocation and use of tax revenue collected by the City of Oakland (respondent or the City) pursuant to Measure Y, an ordinance enacted by the voters to add neighborhood beat officers to the police department, among other purposes. The City has filed an appeal from part of the judgment that declared impermissible the use of Measure Y funds to hire and train new officers to replace those assigned to the neighborhood beat positions, and directed the respondent to refund Measure Y revenue allocated to the impermissible use. In her appeal from the judgment petitioner asks us to reverse the part of the judgment that denied relief in the nature of a declaration that the City is required to maintain a police staff of 802 officers, including six crime reduction team officers. In a second appeal petitioner claims that she was entitled to an award of attorney fees pursuant to Code of Civil Procedure section 1021.5 and the common fund doctrine.[1]

We conclude that the City did not make an impermissible use of Measure Y funds by indirectly hiring and training new officers to replace veteran officers who were assigned to the neighborhood beat positions added by the ordinance. We further conclude that the City was required to appropriate

---

[1] The appeals have been consolidated for all purposes.

funds for, but not actually staff the police force with, the minimum number of officers specified by Measure Y. Finally, we conclude that the trial court did not abuse its discretion by denying petitioner an award of attorney fees. We therefore reverse the judgment in part, and affirm the denial of the award of attorney fees.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

In 2004, the voters in the City enacted Measure Y, an ordinance which imposed a special parcel tax and commercial parking lot surcharge to be used for an "integrated program of violence prevention and public safety intervention." One of the primary specified purposes for the tax proceeds raised by the Measure Y ordinance (the ordinance or Measure Y) was to "[h]ire and maintain" at "least a total of 63 police officers" assigned to enumerated "community-policing" activities: primarily, "[n]eighborhood beat officers," (italics omitted) allocated one to each "community policing beat" solely to "serve the residents of that beat" by providing familiarity with the neighborhood, regular contact and prompt police response; supplemental police response to school safety and truancy; have at least six of the total additional officers assigned to investigate illegal narcotic transactions and violent crimes in identified violence hot spots; and, "additional officers" to "intervene in situations of domestic violence and child abuse."[2] Other specified services to which at least 40 percent of the revenue was apportioned included youth outreach and after-school programs, domestic violence counselors, and fire services.

By its terms Measure Y directed the City to place the funds collected from the taxes into a "special fund" to be "expended only for the purposes authorized" by the ordinance. The special Measure Y revenue fund was maintained separately from the General Fund, and the revenue sources in the Measure Y fund were "legally restricted to expenditures for specified purposes." The City was also required to perform an independent audit annually to "assure accountability and the proper disbursement of the proceeds" in accordance with the stated objectives of Measure Y. An oversight committee was created to review the audits for compliance with the ordinance. Measure Y further provided: "No tax authorized by this Ordinance may be collected in any year that the appropriation for staffing of sworn uniformed police officers is at a level lower than the amount necessary to maintain the number of uniformed officers employed by the City of Oakland for the fiscal year 2003–2004," which was then 739 officers. The taxes imposed by Measure Y

---

[2] Funds in the amount of no more than $500,000 for each fiscal year were also provided to equip and train the additional officers in community policing techniques.

were to "continue in effect for 10 years" following the effective date of the ordinance, January 1, 2005.

Before Measure Y was enacted the Oakland Police Department (the Department) already operated a community policing program staffed with neighborhood beat officers "sometimes referred to as problem solving officers or 'PSO's'." The Department established "57 neighborhood beats," 14 of which were staffed with PSO's prior to the adoption of Measure Y. The Department had been involved in community-based police practices since 1994, and was considered a recognized leader in this approach to law enforcement.

Much of the revenue collected pursuant to the ordinance was not spent to *directly* add new officers to the neighborhood beat assignments. Even before Measure Y was enacted, for various identified reasons the Department assigned only veteran, experienced officers to neighborhood beat positions. Neighborhood beat officers provide a wide range of specialized community policing services which require advanced training and experience with members of the community. According to the Department's preexisting deployment policy (General Order No. B-4), newly sworn officers, even after completing academy training, must successfully engage in patrol duties for a minimum of three years to gain needed experience before any transfer to neighborhood beat positions; the Department thereafter determines if patrol officers are ready and suited for community policing positions or other "out of patrol" assignments. After Measure Y was enacted the Department continued to follow its considered practice of assigning new officers to patrol rather than directly to the specialized community policing positions funded by the ordinance. With this practice in place the City implemented a policy to use Measure Y funds to recruit, hire and train additional new officers, who were assigned initially to patrol duties "to backfill" the positions of veteran officers who were transferred to the neighborhood beat positions.

Also, the Department did not immediately assign veteran officers to fill all of the neighborhood beat positions funded by Measure Y. To do so, the Department decided, would adversely impact essential patrol, response and emergency services while new officers were hired and trained, particularly due to the high attrition rate that resulted in the continuing loss of veteran officers both before and after the passage of Measure Y.

The City expended the revenue obtained from Measure Y to undertake a program of recruiting, hiring and training new officers to increase the Department staff to levels mandated by the ordinance. However, due to an even greater loss of existing officers through injuries and retirement, as well as unusually high attrition from the police academies, Department staffing

levels decreased and the neighborhood beat positions were not promptly filled to the extent specified in Measure Y. By the middle of 2005, the Department force was 116 officers below the minimum level authorized by Measure Y, and only five new neighborhood beat officers had been assigned.

In response, by September of 2005, the City adopted a "40 percent formula" to distribute funding to Measure Y objectives. The Department's deployment strategy was to assign 60 percent of its officers to patrol and 40 percent to community policing activities. Veteran police officers were deployed to Measure Y community policing positions at a rate of 40 percent of the newly hired officers, and 40 percent of the Measure Y funds were allocated to the costs associated with recruitment, hiring and training of new officers.

Thereafter, the Department adhered to the 40 percent formula in funding and deployment of officers, in an attempt to fill the many neighborhood beat positions that remained vacant. In March of 2006, the Department obtained approval from the City to devote additional revenue from the general and Measure Y funds in accordance with the 40 percent formula to an "Accelerated Recruitment and Training Program." As a result, more neighborhood beat positions were filled as new officers completed academy training and mandatory field training programs, although Measure Y positions remained unoccupied and Department staffing levels continued to be below authorized strength.

By March of 2008, the City passed Resolution No. 81104 (the resolution) to augment the recruitment and training program with supplementary resources to facilitate the addition of new police officers to the Department force at a higher rate than the loss from attrition. The resolution authorized the City to transfer appropriations in the amount of approximately $7.7 million from the accumulated balance in the Measure Y fund for use in the augmented recruitment and training program. The program approved by the resolution was designed to increase the Department staff and consequently add Measure Y positions. A condition in the resolution specified that to the extent "any Measure Y funds advanced for the recruitment are used for the hiring of non-Measure Y officers, the General Fund shall reimburse the Measure Y Fund for the equitable and proportionate costs of the recruitment of the non-Measure Y officer . . . ." According to the resolution, the City was also required to provide "monthly actionable reports" to track the implementation of the "recruitment plan including a tracking mechanism of the budget and balances and whether they are used for Measure Y or Non-Measure Y purposes."

Following the enactment of this resolution the City engaged in an accelerated recruitment, hiring, training and deployment program that continued to

conform to the 40 percent formula. By November of 2008, the total number of sworn officers in the Department was 768. As of February of 2009, a total of 164 trainees successfully completed the police academy and subsequent field training, and were assigned to patrol and other officer duties. Veteran officers were assigned to a total of 65 neighborhood beat and domestic violence intervention positions, along with supervising sergeants, to provide community policing in each of the 57 neighborhood beats, in addition to the 14 PSO's previously assigned to neighborhood beat positions—who were not paid with Measure Y funds.[3] A total of 12 of the officers who were hired and trained by the Department following the enactment of Measure Y were ultimately deployed to community policing positions once they successfully completed patrol duties. The number of officers exceeded the minimum level of 739, plus 63 neighborhood beat officers, set by the ordinance.

The City also adduced evidence that the Measure Y fund was charged with 40 percent of hiring-related costs before the resolution, and 100 percent of the costs of the augmented recruitment program. Evidence at trial demonstrated the "new hires" following the resolution were deployed to "Measure Y duties," and none of the funds authorized by the resolution have been spent "for non-Measure Y hiring." The City's professed policy is to reimburse the Measure Y fund for any "equitable and proportionate costs" of any officers not deployed to Measure Y duties, in accordance with the resolution.

The petition for writ of mandate and complaint for injunctive relief filed by Sacks in April of 2008, sought to prohibit further collection of Measure Y revenue by the City until proof of compliance with the conditions specified in the ordinance, specifically: the assignment of the "full complement of 63 Measure Y officers," a total staff of 803 officers in the Department, and only "63 officers funded through Measure Y" funds. Sacks also requested reimbursement of all Measure Y revenue unlawfully expended for recruitment, training and duties performed by officers "not related to Measure Y."

Following a hearing at which documentary evidence was considered, the trial court granted in part the petition for writ of mandate. The court found that use of Measure Y funds to hire and train officers "who were not placed into Measure Y positions" was "not permitted" by the ordinance. Specifically, the court determined that use of Measure Y funds pursuant to the 2008 augmented recruitment program to train officers who "backfill patrol assignments in order to free up veterans for Measure Y positions," was an "impermissible use of Measure Y funds." The City was directed to "refund all Measure Y monies" expended "for recruitment, hiring and academy training

---

[3] As of January of 2009, the officers hired and trained after 2008 pursuant to the augmented recruitment program as specified in the resolution had not yet completed mandatory academy and field training, and thus they had not been deployed to any assignments.

of officers not placed *directly* into Measure Y positions." (Italics added.) The court further found that the City failed to complete the audits required by the ordinance and Government Code section 50075.1, and ordered City to "conduct independent audits for each year from January 1, 2005 through the present."

The trial court denied petitioner's request for a declaration that the City has a "ministerial duty to maintain a police staff of 802 police officers," including 63 neighborhood beat officers and a "base staff of 739 officers," as not mandated by Measure Y. The court found that although Measure Y imposes upon the City a duty to "appropriate funds for such positions," those positions need not be actually filled by the Department with "a certain number of officers in order to collect the tax" imposed by the ordinance. Also, no ministerial duty on the part of the Department to assign the neighborhood beat officers to "spend 100% of their time working within their beat" was found by the court. The court declared that the City proved officers had been assigned to all of the neighborhood beat positions as of September of 2008, and those officers were not required by Measure Y to "remain within the geographic confines of the beat at all times." Petitioner was denied relief in the form of a tax refund for herself or other taxpayers. Her subsequent request for attorney fees was also denied.

The City has filed an appeal from the part of the judgment that found Measure Y funds may not be used to hire and train new officers who are "not placed in Measure Y positions." The City also filed an appeal from the order to complete the required audits, but subsequently performed the audits, and that portion of the appeal has therefore been rendered moot. (*MHC Operating Limited Partnership v. City of San Jose* (2003) 106 Cal.App.4th 204, 214 [130 Cal.Rptr.2d 564].)

Petitioner's appeal seeks review of the trial court's order that the City has a duty to appropriate funds for a baseline police force of 739, but not a duty to actually staff that number of officers. In a separate appeal she has also challenged the trial court's order that denied her an award of attorney fees.

## DISCUSSION

*The City's Appeal*

I. *The Expenditure of Measure Y Funds by the City to Hire and Train Officers Not Directly Assigned to Neighborhood Beat Positions.*

The City argues that the trial court erred by finding the ordinance imposes a ministerial duty to allocate all revenue collected pursuant to Measure Y to

hiring and training officers to be placed *directly* into Measure Y positions. The City's position is that the mandatory duty stated in the ordinance to "[h]ire and maintain" at least a total of 63 officers assigned to "community-policing objectives" is not specifically delineated, and must be interpreted to mean that the neighborhood beat positions may be filled with "fully trained veterans," not just "newly hired officers." The City points out that according to recognized preexisting hiring and deployment policies, newly hired and trained officers were not assigned to the neighborhood beat positions. With the ambiguous nature of the language of the ordinance, the argument proceeds, the voters did not express an intention to "affect the City's exercise of discretion" to expend revenue "to recruit and train officers who backfill in patrol for veterans assigned to Measure Y positions." Indeed, there is no express language in the ordinance that directs the department to change established and reasonable internal practices.

Petitioner responds that the text of Measure Y imposes a duty on the City to allocate revenue generated from Measure Y only to the addition of "Measure Y officers themselves, not other people, who may or may not 'backfill' for them." Her position is that Measure Y authorizes the expenditure of the collected tax revenue on "recruitment or academy training expenses for officers placed directly into Measure Y positions." She adds that "because the City spent Measure Y funds for officers who were not placed into Measure Y positions, the City's actions were illegal."

█ We are reviewing the trial court's ruling that granted petitioner's request for issuance of a writ of mandate. " 'Code of Civil Procedure section 1085 permits the issuance of a writ of mandate "to compel the performance of an act which the law specially enjoins." [Citation.] The writ will lie where the petitioner has no plain, speedy and adequate alternative remedy, *the respondent* has a clear, present and usually ministerial duty to perform, and the petitioner has a clear, present and beneficial right to performance.' [Citation.]" (*Sacramento County Alliance of Law Enforcement v. County of Sacramento* (2007) 151 Cal.App.4th 1012, 1020 [60 Cal.Rptr.3d 202].) " 'A ministerial duty is an act that a public officer is obligated to perform in a prescribed manner required by law when a given state of facts exists.' [Citation.]" (*Lewis v. Superior Court* (2008) 169 Cal.App.4th 70, 77 [86 Cal.Rptr.3d 565].)

While a writ may issue against a county, city or other public body or against a public officer, " 'the writ will not lie to control discretion conferred upon a public officer or agency. [Citations.] Two basic requirements are essential to the issuance of the writ: (1) A clear, present and usually ministerial duty upon the part of the respondent [citations]; and (2) a clear, present and beneficial right in the petitioner to the performance of that duty

[citation]. [Citation.]' [Citations.]" (*Shamsian v. Department of Conservation* (2006) 136 Cal.App.4th 621, 639–640 [39 Cal.Rptr.3d 62].) Our review of the City's implementation of the ordinance " ' "is limited to an inquiry into whether the action was arbitrary, capricious or entirely lacking in evidentiary support. [Citation.]" . . . "With respect to these questions the trial and appellate courts perform essentially the same function, and the conclusions of the trial court are not conclusive on appeal." ' [Citation.]" (*Marshall v. Pasadena Unified School Dist.* (2004) 119 Cal.App.4th 1241, 1253 [15 Cal.Rptr.3d 344]; see also *Johnson v. City and County of San Francisco* (2006) 137 Cal.App.4th 7, 12 [40 Cal.Rptr.3d 8]; *Los Angeles Lincoln Place Investors, Ltd. v. City of Los Angeles* (1997) 54 Cal.App.4th 53, 59 [62 Cal.Rptr.2d 600].)

██ To determine the propriety of the City's expenditure of Measure Y funds, we must interpret the language of the ordinance. " 'When we interpret the meaning of statutes, our fundamental task is to ascertain the aim and goal of the lawmakers so as to effectuate the purpose of the statute.' [Citation.] 'We take a three-step sequential approach to interpreting statutory language. [Citation.] First, we will examine the language at issue, giving "the words of the statute their ordinary, everyday meaning." [Citations.] If we conclude that the statutory meaning is free of doubt, uncertainty, or ambiguity, the language of the statute controls, and our task is completed. [Citations.] Second, if we determine that the language is unclear, we will attempt to determine the Legislature's intent as an aid to statutory construction. [Citation.] In attempting to ascertain that intent, "we must examine the legislative history and statutory context of the act under scrutiny. [Citations.]" [Citation.] Third, if the clear meaning of the statutory language is not evident after attempting to ascertain its ordinary meaning or its meaning as derived from legislative intent, we will "apply reason, practicality, and common sense to the language at hand. If possible, the words should be interpreted to make them workable and reasonable [citations], . . . practical [citations], in accord with common sense and justice, and to avoid an absurd result [citations]." [Citation.]' [Citation.]" (*Cummings v. Stanley* (2009) 177 Cal.App.4th 493, 507–508 [99 Cal.Rptr.3d 284].)

Where, as here, the pertinent facts are undisputed and the issue of the City's mandatory duty under the ordinance presents an issue of statutory interpretation, "the question is one of law and we engage in a de novo review of the trial court's determination." (*Marshall v. Pasadena Unified School Dist., supra*, 119 Cal.App.4th 1241, 1253; see also *Shamsian v. Department of Conservation, supra*, 136 Cal.App.4th 621, 631.) " ' "As the matter is a question of law, we are not bound by evidence on the question presented below or by the lower court's interpretation. [Citations.]" [Citation.]' [Citations.]" (*Cummings v. Stanley, supra*, 177 Cal.App.4th 493, 508.)

■ We must also be guided by established principles that govern the enactment and interpretation of revenue measures presented by a municipality to the electorate. The relationship between the public entity and the electorate arising out of voter-approved revenue measures has been alternatively described as "either strictly contractual or analogous to a contract." (*Committee for Responsible School Expansion v. Hermosa Beach City School Dist.* (2006) 142 Cal.App.4th 1178, 1191 [48 Cal.Rptr.3d 705] (*Hermosa Beach*), citing *Associated Students of North Peralta Community College v. Board of Trustees* (1979) 92 Cal.App.3d 672, 676–677 [155 Cal.Rptr. 250] (*Associated Students*).) When discussing bond measures the cases aver that while a precise characterization of the relationship is unnecessary, " 'It is clear that proceeds of a bond issue may be expended only for the purpose authorized by the voters in approving issue of the bonds [citation]. Whether the limitation be deemed to be contractual [citation] or of a status analogous to such relation [citation] or a restriction implied by the requirement of popular approval of the bonds [citation], it does restrict the power of the public body in the expenditure of the bond issue proceeds, and hence in the nature of the project to be completed and paid for. The statutes and ordinances under which the public body acts in submitting the bond issue proposal to the voters must be considered with the ballot proposition in determining the extent of this restriction [citations].' [Citation.]" (*San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley Unified School Dist.* (2006) 139 Cal.App.4th 1356, 1397 [44 Cal.Rptr.3d 128].)

■ Examining the language of the ordinance, Measure Y has several components, all of which focus on the rather broad articulated objective of financing "violence prevention and public safety intervention" programs. The declared primary target of the collection and expenditure of revenue under Measure Y, and the one at issue here, is to "[h]ire and maintain" a minimum of "63 police officers" to be assigned as "[n]eighborhood beat officers" (italics omitted) in each existing "community policing beat." The ordinance directs the City to place Measure Y tax revenue in a special fund, which must be maintained separately from the General Fund. The City is authorized to expend the Measure Y funds "only for the purposes" approved and specified by the ordinance.

While Measure Y clearly compels the City to "hire and maintain" a minimum of 63 additional neighborhood beat officers with the collected tax revenue, the manner and timing of the obligation is entirely unstated in the ordinance. The ordinance neither prohibits the City from filling the neighborhood beat positions with newly hired and trained officers, nor does it provide that the City must do so. It also clearly does not preclude the City from assigning veteran officers to the neighborhood beat positions, and filling their former positions with inexperienced officers.

■ Also, the directive to hire *and* maintain is quite broad in its reach. The maintenance aspect of Measure Y cannot be ignored, as we are loathe to reach an interpretation which renders a part of the ordinance superfluous. (*Chaffee v. San Francisco Public Library Com.* (2005) 134 Cal.App.4th 109, 114 [36 Cal.Rptr.3d 1]; *Baldwin v. City of Los Angeles* (1999) 70 Cal.App.4th 819, 838 [83 Cal.Rptr.2d 178].) The City must not only recruit and employ the requisite number of neighborhood beat officers, but is further obligated by the language of the ordinance to appropriately sustain the force to promote the underlying public safety objective. How the City may or must do so, and how quickly, is the crux of the dispute before us. The ordinance is in all these respects ambiguous, even silent, apparently "drafted to leave the City significant flexibility" in carrying out the plan to add officers to the force. (*Monette-Shaw v. San Francisco Bd. of Supervisors* (2006) 139 Cal.App.4th 1210, 1221 [43 Cal.Rptr.3d 659] (*Monette-Shaw*).) ■ As this court pointed out in *Monette-Shaw, supra*, at page 1221, when construing a bond measure issued " 'for the acquisition, improvement, construction and/or reconstruction of a health care, assisted living and/or other type of continuing care facility or facilities' " to replace Laguna Honda Hospital, "[t]here is nothing improper in providing for such flexibility. '[T]he rule is that public bodies may submit bond propositions in broad and general terms. Such a body may make its order of submission "just as broad, and just as narrow[,]" or just as specific as it is willing to be bound by.' [Citations.]" Indeed, it is reasonable under this ordinance to expect the voters had no interest in micromanaging the Oakland Police Department. Courts should exercise a similar reluctance.

■ We thus consider extrinsic sources, including the ostensible objects to be achieved and the legislative history, with a view to promoting rather than defeating the general purpose of the statute, and reaching a workable interpretation that is in accord with practicality and common sense. (*Estate of Griswold* (2001) 25 Cal.4th 904, 910–911 [108 Cal.Rptr.2d 165, 24 P.3d 1191]; *Marshall v. Pasadena Unified School Dist., supra*, 119 Cal.App.4th 1241, 1254.) We must also " 'discern the sense of the statute, and therefore its words, *in the legal and broader culture. . . .*' [Citation.]" (*Hodges v. Superior Court* (1999) 21 Cal.4th 109, 114 [86 Cal.Rptr.2d 884, 980 P.2d 433]; see also *Garcia v. Superior Court* (2006) 137 Cal.App.4th 342, 351 [39 Cal.Rptr.3d 902].)

We begin by observing that when Measure Y was enacted the City already had in place distinct policies governing the hiring, training and placement of its police officers. Specifically, the Department was bound by state law and its own operational standards that mandated an extensive course of 26 weeks of police academy training, followed by a 16-week field training program, before any officer was authorized to progress beyond probationary status to a patrol position or any other assignment. (Pen. Code, § 832, subd. (a).) The

then current deployment policies for neighborhood beat appointments also required that once officers completed academy and field training they were initially assigned to random patrol duties to gain the knowledge and experience considered necessary by the Department to properly perform the wide range of specialized community policing services required of neighborhood beat officers. After the ordinance was enacted the Department used Measure Y funds to recruit, hire and train additional new officers, and continued to follow its practice of assigning those officers to fill the patrol positions of veteran officers, who were transferred to the neighborhood beat positions.

■ Nothing in Measure Y manifests the slightest intent of the electorate to alter the Department's defined, mandatory hiring and training practices. We assume the electorate, when enacting Measure Y, was aware of preexisting related laws and intended to maintain a consistent body of rules that harmonizes and gives effect to both. (*Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1048 [56 Cal.Rptr.3d 814, 155 P.3d 226]; *Stone Street Capital, LLC v. California State Lottery Com.* (2008) 165 Cal.App.4th 109, 118 [80 Cal.Rptr.3d 326]; *People v. Vessell* (1995) 36 Cal.App.4th 285, 289 [42 Cal.Rptr.2d 241].) "The voters are presumed to be aware of existing law (*Horwich v. Superior Court* (1999) 21 Cal.4th 272, 283 [87 Cal.Rptr.2d 222, 980 P.2d 927]), including the administrative enforcement provisions." (*Farmers Ins. Exchange v. Superior Court* (2006) 137 Cal.App.4th 842, 855 [40 Cal.Rptr.3d 653]; see also *People ex rel. Kerr v. County of Orange* (2003) 106 Cal.App.4th 914, 939 [131 Cal.Rptr.2d 274]; *People v. Superior Court (Gevorgyan)* (2001) 91 Cal.App.4th 602, 610 [110 Cal.Rptr.2d 668].) While we realize that the voters cannot be expected to have been specifically aware of the Department's deployment policies before Measure Y became effective, we are persuaded that the electorate did not intend to alter existing state law and analogous Department rules like labor agreements and MOU's (memoranda of understanding) that regulated the training and placement of officers in neighborhood beat positions. (See *In re Summer H.* (2006) 139 Cal.App.4th 1315, 1329–1331 [43 Cal.Rptr.3d 682].)

■ The use of Measure Y revenue to hire and train officers to replace those assigned to neighborhood beat positions—that is, to "backfill" patrol positions—rather than to directly add new officers to the neighborhood beat assignments, also promotes the fundamental legislative intent to improve public safety. The City presented persuasive, uncontradicted evidence before the trial court that experienced, proven officers more successfully provide the comprehensive, specialized services necessary in neighborhood beat assignments. Newly sworn officers also obtain knowledge and familiarity with "policing functions" if assigned to patrol duties before they are transferred to more focused neighborhood beat assignments. In addition, the Department has the opportunity to "assess the capabilities" of officers in patrol assignments prior to transfer to a neighborhood beat position. An interpretation of

the ordinance that does not force the Department to depart from established, effective procedures in the deployment of officers better serves the intent of the voters and the legislative purpose of Measure Y stated in the legislation itself, the ballot arguments, and the analysis of the City Attorney. (*Hodges v. Superior Court, supra*, 21 Cal.4th 109, 115–118.) After all, this measure was designed to increase the effectiveness of the Oakland Police Department, not foster a redesign of it. This court may also "consider the impact of an interpretation on public policy, for '[w]here uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation.' [Citation.]" (*Mejia v. Reed* (2003) 31 Cal.4th 657, 663 [3 Cal.Rptr.3d 390, 74 P.3d 166]; see *Party City Corp. v. Superior Court* (2008) 169 Cal.App.4th 497, 508 [86 Cal.Rptr.3d 721].)

Without any indication in Measure Y that the imprecise obligation imposed on the City to "hire and maintain" police officers mandates immediate and direct assignment of officers to the created community policing positions, we find that a broad interpretation of the ordinance to authorize the City to fill those positions with veteran officers, who are in turn replaced with newly hired officers, is a reasonable, commonsense result that comports with the legislative intent. We cannot insert words or requirements into a measure that are not expressed to interpret the law in a way that does not conform to the apparent legislative intent. (*Citizens to Save California v. California Fair Political Practices Com.* (2006) 145 Cal.App.4th 736, 747–748 [52 Cal.Rptr.3d 17]; *Tain v. State Bd. of Chiropractic Examiners* (2005) 130 Cal.App.4th 609, 617 [30 Cal.Rptr.3d 330].) We are also not inclined to impose a requirement not expressed in the measure, where to do so makes compliance more burdensome without necessarily furthering the objectives of the law. (See *People v. Martinez* (2004) 116 Cal.App.4th 753, 760–761 [10 Cal.Rptr.3d 751].)

We are convinced that the expansive language of Measure Y disfavors any interpretation of the ordinance that would bind the City to implementation of novel, specific plans and procedures associated with addition of the neighborhood beat officers. (See *Tooker v. San Francisco Bay Area Rapid Transit Dist.* (1972) 22 Cal.App.3d 643, 649–650 [99 Cal.Rptr. 361] (*Tooker*); *Mills v. S. F. Bay Area Rapid Transit Dist.* (1968) 261 Cal.App.2d 666, 669 [68 Cal.Rptr. 317] (*Mills*).)[4] In *Monette-Shaw, supra*, 139 Cal.App.4th 1210, 1221, the challenged ordinance title stated that bonds would be issued " 'for the

---

[4] In *Tooker, supra*, 22 Cal.App.3d 643, 649, the plaintiffs in a class action requested an order prohibiting the San Francisco Bay Area Rapid Transit District (BART), acting under a 1971 agreement with the City and County of San Francisco, from proceeding with the construction of a transit station on the Embarcadero and the substitution of surface trackage for a subway in the West Portal area, on the ground that the agreement was ultra vires and invalid. This court observed that "the BART resolution stating the purposes of and calling the bond election, and the acceptance of the ballot proposition by the voters, was analogous to a contract between BART

acquisition, improvement, construction and/or reconstruction of a health care, assisted living and/or other type of continuing care facility or facilities to replace Laguna Honda Hospital.' Section 1 of the ordinance authorize[d] the City to incur debt for the 'Project,' and section 2 define[d] the 'Project' to 'include, without limitation, all works . . . necessary or convenient for the acquisition, improvement, construction and/or reconstruction of a new health care, assisted living and/or other type of continuing care facility or facilities to replace Laguna Honda Hospital.' The ballot proposition itself use[d] the same broad language, stating that the debt will be incurred 'for the acquisition, improvement, construction and/or reconstruction of a new health care, assisted living and/or other type of continuing care facility or facilities to replace Laguna Honda Hospital.' " This court affirmed the denial of a petition for writ of mandate which sought to prevent the City and County of San Francisco from diverting tobacco settlement revenues away from the project to replace Laguna Honda Hospital and to require the City to maintain Laguna Honda as a 1,200-bed skilled nursing facility. (*Id.* at pp. 1213–1214.) We found that the voters expressly "granted the City freedom to choose among a broad range of options for replacing Laguna Honda" (*id.* at p. 1222), and did not "bind the City to any particular size, floor plan, or configuration of services based on the expectations of petitioner or any other individual who had an expectation different from the language of the approved proposition and ordinance." (*Id.* at p. 1223.)

Here too, the broad language of the ordinance bound the City to hire and maintain a staff of neighborhood beat officers of the requisite size, but did not impose any requirement that the positions must be filled with newly hired officers trained with Measure Y revenue. (See *Monette-Shaw, supra,* 139 Cal.App.4th 1210, 1223; *Associated Students, supra,* 92 Cal.App.3d 672, 677–678.) Nothing in the ballot proposition or associated materials submitted

---

and the voters or at least the taxpayers of the district," and "must be respected," but declined to require construction of a specific subway facility. (*Ibid.*) We concluded "that nowhere in the Act, or in BART's resolution calling the bond election and stating the object and purpose of incurring the bonded indebtedness, or in the specific proposals placed before the district's voters on voting machines and paper ballots, is there any statement or indication that the intended plans embraced a West Portal subway, or indeed any specific subway location anywhere in the system. Instead general language was used; details of whether any, and which, parts of the proposed system would be elevated, or on the surface, or underground, were nowhere stated." (*Id.* at pp. 649–650.)

Similarly, in *Mills, supra,* 261 Cal.App.2d 666, 667–668, an action for declaratory and injunctive relief sought to compel location of the Lafayette station of defendant BART. The proposition printed on the ballot described only in the most general terms its object and purpose of " 'acquiring, constructing and operating a rapid transit system,' including a number of items, among them 'terminals.' " The court rejected the requirement of building a particular station because "neither the ballot proposition nor the notice of election specified the location of any station, nor even required a station in or adjoining Lafayette." (*Id.* at p. 669.)

to the voters manifests an intent to negate or constrain the Department's discretion to follow existing administrative procedures in the expenditure of Measure Y funds to add a mandatory number of new neighborhood beat officers to the police force. The allocation of revenue by the City to hire and train new officers, who were then added to the force as other officers were assigned to neighborhood beat positions, was consistent with the voters' intent. (See *Hermosa Beach, supra,* 142 Cal.App.4th 1178, 1191.)

 We further interpret the ordinance to authorize the expenditure of Measure Y funds to *recruit and train* the new officers needed to fill the Measure Y positions. Otherwise, the City would be prevented from reaching an intended source of revenue to facilitate the addition to the force of the very officers needed to staff the additional positions contemplated by Measure Y, an incongruous and unintended outcome. The evidence unmistakably demonstrates that new officers cannot be hired, and the City's police force cannot be maintained, unless the revenue from Measure Y is at least partially used for the recruitment and training of new officers needed to replace those lost to attrition. To us, recruiting and training officers is an essential aspect of the mandate in the ordinance to "hire and maintain." " 'In construing a statute, a court may consider the consequences that would follow from a particular construction and will not readily imply an unreasonable legislative purpose. . . . [A] practical construction is preferred. [Citation.]' [Citation.]" (*Wong v. Ohlone College* (2006) 137 Cal.App.4th 1379, 1383–1384 [40 Cal.Rptr.3d 923].) A commonsense interpretation of the language of the ordinance is required to make it workable and avoid an absurd result. (*Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1122 [29 Cal.Rptr.3d 262, 112 P.3d 647] (*Wasatch*).)

 We conclude, contrary to the trial court's determination, that Measure Y does not compel the City to expend Measure Y funds only to hire officers who are *directly* assigned to neighborhood beat positions. The City may use Measure Y revenue to recruit, hire, and train new officers for initial assignment to non-Measure Y positions, as long as the requisite number of other officers are correspondingly assigned to the neighborhood beat positions specified in the ordinance.[5] Therefore, the trial court erred by finding that the City made an "impermissible use of Measure Y funds" by hiring and training officers to "backfill patrol assignments in order to free up veterans for Measure Y positions," and ordering the City to refund Measure Y funds expended "for recruitment, hiring and academy training of officers not placed *directly* into Measure Y positions." (Italics added.)

---

[5] Our conclusion is consistent with our reading of the City Attorney's opinion on this issue. (Russo, Legal Opinion (Feb. 7, 2008) <http://www.oaklandcityattorney.org/PDFS/Opinions/MeasureYOpinion.pdf> [as of Dec. 10, 2010].)

II. *The City's Compliance with the Requirements of Measure Y.*

Additional inquiries into the City's compliance with Measure Y remain, which require us to further interpret the ordinance. Sacks complains that the City did not fill the entire complement of 63 neighborhood beat positions, or increase the total Department staff to the number of positions mandated by Measure Y "by the time she filed suit in April, 2008."[6] Instead, she argues, the City "used Measure Y funds to recruit and train new police officers, and failed to fill Measure Y positions, as clearly required by the law." She also asserts that the City did not abide by the 40 percent formula. Instead, she complains, the City used 40 percent of the Measure Y revenue but failed to deploy that percentage of officers to Measure Y positions "at the time this action was filed."

Sacks is correct that when she *filed* her petition the Measure Y positions were not completely filled, nor had the Department reached the minimum total staff level required by the ordinance. The City established, however, that by the date of the hearing on the petition, and indeed by no later than September of 2008, as a result of the Accelerated Recruitment and Training Program the full measure of 65 neighborhood beat and domestic violence intervention positions, along with supervising sergeants, had been assigned to provide community policing in each of the 57 neighborhood beats—in addition to the officers who had been assigned to neighborhood beat positions before Measure Y. Most of the neighborhood beat assignments were filled with veteran officers, but a total of 12 officers who were hired and trained by the Department following the enactment of Measure Y—out of a total of 164 officers who completed police academy and subsequent field training—were ultimately deployed to community policing positions once they successfully concluded patrol duties. The Department's total staff also exceeded the Measure Y requirements.

Thus, the City failed to promptly comply with the ordinance, but did so gradually, and completed the staffing commanded by Measure Y well within a five-year period. Importantly, Measure Y imposes neither any time limits on the City's obligations to satisfy the staffing requirements of the ordinance, nor specifications on the manner of compliance, and with good reason. As the evidence reveals, several variables, none insignificant, affected the City's ability to comply, and the pace at which compliance occurred: the attrition rate of existing officers; the time needed for recruitment and training of new officers, and their degree of success at both training and patrol assignments; the lengthy process of training new officers that encompassed two to three years; and the fact that existing officers could not be

---

[6] Petitioner points out that as of January 2008, "only 36 of the required 63 Measure Y positions had been filled."

removed from patrol positions indiscriminately without adversely impacting the Department's response to emergency calls and other essential police services. Expeditious compliance was also financially impractical or perhaps impossible. The revenue generated by Measure Y did not immediately provide the funds necessary for hiring and maintaining the full staff of officers specified by the ordinance. Until adequate revenue accumulated in the Measure Y fund, the City was forced to fill positions gradually.

 The silence of the ordinance as to the timing and procedures employed to fill the positions was not only proper, but also legally imperative. "The electorate has the power to initiate legislative acts, but not administrative ones: 'While it has been generally said that the reserved power of initiative and referendum accorded by article IV, section 1, of the Constitution is to be liberally construed to uphold it whenever reasonable [citations], it is established beyond dispute that the power of referendum may be invoked only with respect to matters which are strictly legislative in character [citations]. Under an unbroken line of authorities, administrative or executive acts are not within the reach of the referendum process [citations]. The plausible rationale for this rule espoused in numerous cases is that to allow the referendum or initiative to be invoked to annul or delay the executive or administrative conduct would destroy the efficient administration of the business affairs of a city or municipality [citations].' [Citation.]" (*City of San Diego v. Dunkl* (2001) 86 Cal.App.4th 384, 399 [103 Cal.Rptr.2d 269].) "An enactment that interferes with the City's ability to carry out its day-to-day business is not a proper subject of voter power." (*Id.* at p. 400.) "Legislative acts are those that declare a public purpose whereas administrative, sometimes called adjudicative or quasi-adjudicative, acts implement the steps necessary to carry out that legislative purpose." (*Citizens for Planning Responsibly v. County of San Luis Obispo* (2009) 176 Cal.App.4th 357, 367 [97 Cal.Rptr.3d 636].) "When implementing a plan adopted by a superior power, a city acts in an administrative capacity." (*Worthington v. City Council of Rohnert Park* (2005) 130 Cal.App.4th 1132, 1141 [31 Cal.Rptr.3d 59].) Here, while the ordinance properly articulated the particular purposes to which the use of Measure Y funds were directed, the City correctly retained the authority and administrative discretion to implement the legislation.

 Absent language in Measure Y that specified time and manner of execution, we imply reasonable terms and a practical construction of the ordinance. (See *California Correctional Peace Officers Assn. v. State Personnel Bd.* (1995) 10 Cal.4th 1133, 1147 [43 Cal.Rptr.2d 693, 899 P.2d 79]; *Wong v. Ohlone College, supra,* 137 Cal.App.4th 1379, 1383–1384.) We must also accord great weight to the administrative agency's interpretation and implementation of the ordinance it was charged with executing. (*Ste. Marie v. Riverside County Regional Park & Open-Space Dist.* (2009) 46 Cal.4th 282, 292 [93 Cal.Rptr.3d 369, 206 P.3d 739]; *Mason v. Retirement*

*Board* (2003) 111 Cal.App.4th 1221, 1228 [4 Cal.Rptr.3d 619]; *County of Santa Barbara v. Connell* (1999) 72 Cal.App.4th 175, 185 [85 Cal.Rptr.2d 43].) We are persuaded that the City acted in a reasonable manner and within its administrative discretion to eventually realize the specified objective of adding the staff mandated by Measure Y through a program of transferring veteran officers to neighborhood beat positions and training newly hired officers to replace them. Sound policy reasons were articulated for the Department's decision to delay the reassignment of veteran officers to neighborhood beat positions until enough new officers were hired and trained to adequately fill patrol assignments, so that emergency and other essential police services were not compromised. We also conclude that the City's performance of the obligations imposed by Measure Y, while far from immediate, at least occurred within a reasonable time under the challenging circumstances presented.

Finally, the evidence at the hearing established that the Measure Y positions were filled, and in accordance with the 40 percent formula the City ultimately did not improperly use Measure Y revenue for "non-Measure Y hiring." We are somewhat hindered in our review of the City's compliance with the appropriations requirements of Measure Y by the trial court's failure to reach this inquiry—due to the finding that indirect use of Measure Y funds to fill Measure Y positions was impermissible. We know from the record that before the petition was filed in April of 2008, and perhaps even for a brief time thereafter, the Measure Y positions were not entirely filled, and some money collected pursuant to the ordinance had not been used to recruit, hire and train officers deployed to those positions. For instance, costs attributed to the 158th and 159th police academies—in 2006 and 2007—did not result in deployment of any neighborhood beat officers. The Department's Fiscal Services Manager, Peter Fitzsimmons, acknowledged that before 2009, particularly in 2005 and 2006, the "40 percent deployment goal" was not always reached.

The critical timeframe for purposes of our review of the judgment, however, is the date of trial. By then, the City presented undisputed evidence in the form of declarations from Deputy Chief David Kozicki and Peter Fitzsimmons, along with his deposition testimony, that in accordance with the augmented recruitment and training program, 65 officers "funded by Measure Y" had been assigned to community policing duties, as well as 14 other officers who performed Measure Y duties and were paid "with non-Measure Y funds." In addition, as we view the evidence, the City convincingly established that either Measure Y revenue was used to train and deploy Measure Y officers, or the Measure Y fund was reimbursed for any expenditures allocated to non-Measure Y purposes. A firm policy was implemented by the resolution to reimburse the Measure Y fund from the General Fund for the equitable and proportionate costs advanced for the recruitment, hiring and

training of any non-Measure Y officers. Nothing in the record contradicts the City's evidence that the policy was followed.

Petitioner argues that the City failed to follow the 40 percent deployment formula and "misspent" Measure Y funds in an unknown amount that may reach $50 million. To support her argument she focuses on Fitzsimmons's deposition testimony, and spending charts, along with other evidence that no Measure Y positions were filled from the 158th and 159th police academies—when the City apparently decided to enhance patrol services in response to an increase in crime—even though the Department continued to apply the 40 percent formula to expenses associated with those two academies.

However, petitioner disregards the additional testimony by Fitzsimmons that the City immediately recognized the inequity and reimbursed the Measure Y fund accordingly by May of 2008. He also testified that whenever the Department realized the Measure Y deployment did not reach the 40 percent figure, redeployment of officers or reimbursement of the Measure Y fund was undertaken to satisfy the 40 percent formula. Finally, although all of the expenditures for the augmented recruitment program have been charged to the Measure Y fund, all of the officers hired following the resolution have been deployed to "Measure Y duties." The City presented evidence, which remained uncontradicted by petitioner, that by late in 2008 the Measure Y positions had been filled, the Department was staffed at the levels specified in the ordinance, and either Measure Y revenue had been expended to hire and maintain community policing officers, or the Measure Y fund had been reimbursed for all improperly allocated expenses. We find that the City complied with Measure Y within a reasonable time, and did not abuse its discretion in doing so.

*Petitioner's Appeals*

I. *The Finding That the City Is Not Required to Maintain a Total Staff of 802 Officers.*

Petitioner argues in her appeal from the judgment that the trial court erred in its interpretation of a prerequisite to continued collection of Measure Y tax revenue found in part 2, section 4, of the ordinance (section 4), which provides: "No tax authorized by this Ordinance may be collected in any year that the appropriation for staffing of sworn uniformed police officers is at a level lower than the amount necessary to maintain the number of uniformed officers employed by the City of Oakland for the fiscal year 2003–2004 (739)." The trial court found that section 4 explicitly requires the City to appropriate funding to maintain a minimum staff of police officers in the Department, but does not also require the City to actually place the specified

number of officers in positions on the police force.[7] Petitioner complains that the language in the provision is ambiguous, and consideration of the ballot materials reveals an intent to impose on the City an obligation to hire and place "real officers" in the "neighborhoods to protect residents and reduce crime," not just to appropriate funds for " 'paper' officers."

■ Again, our task is to interpret the ordinance, and in this instance the language of section 4 plainly articulates as a condition to collection of Measure Y tax revenue the *"appropriation for staffing* of sworn uniformed police officers" by the City at a minimum level of 739. (Italics added.) The provision does not mention employment or assignment of police officers. Petitioner asserts that the title of section 4 "specifically refers to 'Minimum Police Staffing Prerequisite at Fiscal Year 03-04 Level,' " and "other materials presented in the Voter Information Pamphlet," including the ballot arguments, indicate that the voters were "being promised an increased police force."

■ We need not consult extrinsic materials to discern the meaning of section 4. (*Kavanaugh v. West Sonoma County Union High School Dist.* (2003) 29 Cal.4th 911, 919 [129 Cal.Rptr.2d 811, 62 P.3d 54].) First, petitioner's reliance on the title or heading of the provision is unavailing. The California Supreme Court has noted that " '[t]itle or chapter headings are unofficial and do not alter the explicit scope, meaning, or intent of a statute.' [Citation.]" (*Wasatch, supra*, 35 Cal.4th 1111, 1119.) Moreover, as the trial court observed, in light of the unambiguous language of section 4 that requires "appropriation for staffing," rather than assignment of officers, "we presume that the Legislature, or, in the case of an initiative measure, the voters, intended the meaning apparent on the face of the statute. [Citation.] A court ' "may not add to the statute or rewrite it to conform to an assumed intent that is not apparent in its language." [Citation.]' [Citation.]" (*City of Claremont v. Kruse* (2009) 177 Cal.App.4th 1153, 1172 [100 Cal.Rptr.3d 1].) An interpretation of section 4 to mandate appropriation rather than actual staffing also comports with a commonsense approach, as the City demonstrated that even if adequate appropriations for staffing were obtained through Measure Y revenue, expeditious assignment of officers within the Department was subject to a number of unmanageable vagaries, which included delay in the successful training of recruits and loss of veteran officers through attrition. And finally, the City proved that the requisite number of officers specified in Measure Y had been deployed by the Department by the date of the hearing.

---

[7] The court struck paragraphs 5 through 8 of the petition that alleged the City did not comply with Measure Y by failing to reach a "particular level of staffing" specified in section 4. The court found that the language in section 4 "is not ambiguous," and guaranteed only "appropriation of monies for staffing."

We conclude that the trial court correctly interpreted section 4 to require the City to appropriate funds for staffing of sworn uniformed police officers at the minimum level, but did not mandate actual assignment of officers. In any event, evidence established that the City complied with the section 4 condition by reaching the requisite level of actual staffing within a reasonable time.

## II. *The Six Crime Reduction Team Positions.*

Petitioner also challenges the trial court's finding in the statement of decision that denied her request to enforce a mandatory duty on the part of the City to hire the six crime reduction team (CRT) officers mentioned in part 1, section 3, paragraph (1)(c) of Measure Y. The court determined that petitioner failed to specifically raise the issue "relating to Section 3(1)(c)" in her first amended petition, and denied her request for relief on that basis. Petitioner now complains that "the City's failure to hire the required CRT officers had been properly alleged" in the petition as part of the request for relief "with respect to the City's failure to fill all 63 positions specified in Measure Y," which "included the six CRT positions." She therefore maintains that "it was error for the trial court to deny the relief requested, in light of the undisputed evidence that at the time of the hearing, the City had still failed to fill these positions."

 Part 1, section 3 of the ordinance compels the City to hire and maintain at least a total of 63 officers assigned to specified community policing objectives: one for each of the existing 57 community policing beats, and a crime reduction team of "at least 6 of the total additional officers to investigate and respond to illegal narcotic transactions and commission of violent crimes in identified violence hot spots." Thus, the six CRT positions fall within the total of 63 officers the City was obligated to hire with Measure Y funds. We know from the record that the City assigned a total of "65 officers [to fill the] community policing positions" funded by Measure Y, in compliance with the ordinance. The City also offered evidence that those neighborhood beat officers were assigned to duties that included abatement of illegal narcotics transactions and assaults, as intended by section 3, paragraph (1)(c) of the ordinance. Petitioner did not specifically allege in her petition that noncompliance with Measure Y resulted from the City's failure to assign officers to crime reduction team duties; nor did she seek a further breakdown of the assignments given to the neighborhood beat officers. She also did not adduce any evidence that the City failed to deploy at least 6 of the 65 neighborhood beat officers to the duties mandated by section 3, paragraph (1)(c). In light of the record before us we cannot find that the City violated section 3, paragraph (1)(c) of the ordinance.

III. *The Denial of Petitioner's Request for an Award of Attorney Fees.**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The part of the judgment that declared invalid the City's use of Measure Y funds to hire and train new officers for patrol assignments to replace veteran officers deployed to Measure Y positions, and directed the City to "refund all Measure Y monies" expended "for recruitment, hiring and academy training of officers not placed directly into Measure Y positions," is reversed. In all other respects the judgment is affirmed. The order denying petitioner an award of attorney fees is affirmed.

Each side to bear its own costs.

Marchiano, P. J., and Margulies, J., concurred.

A petition for a rehearing was denied January 5, 2011, and the opinion was modified to read as printed above.

---

*See footnote, *ante*, page 1070.